NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific*</u> <u>*Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

DAVID JOSEPH THOMAS,

                   Petitioner,

             v.

STATE OF ALASKA,

                  Respondent.

Court of Appeals No. A-12853
Trial Court No. 3AN-14-8238 CR

O P I N I O N

No. 2579 — January 5, 2018

Petition for Review from the Superior Court, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Michael T. Schwaiger, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Petitioner. Tamara E. De Lucia, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Respondent.

Before: Mannheimer, Chief Judge, and Allard and Wollenberg, Judges.

Judge ALLARD.

This petition for review involves a superior court's rejection of a plea agreement in a murder case. For the reasons explained in this opinion, we grant the petition and vacate the superior court's decision. On remand, we direct the superior court to reconsider the plea agreement with the guidance provided here.

*Underlying facts and procedural history*

In 2014, David Joseph Thomas was indicted for first- and second-degree murder for the death of his girlfriend, Linda Bower. Thomas confessed that he had killed Bower — first to his brother and then separately to the police, after turning himself in to custody.

According to the parties' briefing and the presentence report, Thomas was heavily intoxicated at the time of the murder. Thomas reported having ingested a large amount of vodka and over-the-counter medication prior to taking Bower to his house to watch movies. He remembered little of what happened thereafter, although he recalled waking to find himself strangling Bower and then losing consciousness again. The next thing he remembered was waking up on the floor of his bedroom, with Bower lying unmoving on the bed. Thomas attempted mouth-to-mouth resuscitation; then he vomited and again lost consciousness. After Thomas turned himself in, the police searched the residence; they found an empty bottle of vodka and vomit in Thomas's bedroom.

Thomas accepted responsibility for killing Bower and reached a plea agreement with the State. Under the terms of this agreement, Thomas would plead guilty to second-degree murder and he would receive a sentence of 75 years' imprisonment with 25 years suspended (50 years to serve).

At the time of Thomas's offense, the crime of second-degree murder carried a mandatory minimum sentence of 10 years and a maximum sentence of 99 years.[1] The crime of first-degree murder carried a mandatory minimum sentence of 20 years and a

---

[1]　Former AS 12.55.125(b) (2014). In 2016, the legislature increased the mandatory minimum sentence for both second-degree murder and first-degree murder. The mandatory minimum sentence for second-degree murder is now 15 years with a maximum of 99 years.

maximum sentence of 99 years.[2]  In *Page v. State*, this Court announced a benchmark sentencing range of 20-30 years to serve for first felony offenders convicted of second-degree murder.[3]  This benchmark range can be exceeded for good cause,[4] and the parties agreed that good cause existed here to exceed the *Page* benchmark.

At the change of plea hearing, the victim's parents told the superior court that they thought Thomas's sentence under the plea agreement was improperly lenient. The parents were particularly opposed to the fact that the plea agreement did not contain a restriction on Thomas's eligibility to be considered by the Parole Board for release on discretionary parole.  Under AS 33.16.090(b)(1), a defendant convicted of murder is eligible to be considered for discretionary parole after serving one-third of their active term of imprisonment.

After hearing from the parents and the parties, the judge conditionally accepted Thomas's guilty plea.  But the judge declared that he would defer his final decision on whether to accept the negotiated sentence until a presentence report was prepared.

In a sentencing memorandum submitted to the court, the prosecutor explained the State's reasons for entering into the negotiated agreement.  With regard to the level of the charge, the prosecutor explained that, given the evidence of Thomas's substantial intoxication, the State would have significant difficulty proving the specific

---

[2]  Former AS 12.55.125(a) (2014).  The mandatory minimum sentence for first-degree murder is now 30 years with a maximum sentence of 99 years.

[3]  *Page v. State*, 657 P.2d 850, 855 (Alaska App. 1983).  On petition, the State confirms that Thomas is a first felony offender (although it notes that the trial prosecutor had asserted that a prior Montana conviction might possibly qualify as a felony under Alaska law).

[4]  *See Carlson v. State*, 128 P.3d 197, 203-04 (Alaska App. 2006).

intent necessary to convict Thomas of first-degree murder.[5] The prosecutor also noted that Thomas had accepted responsibility for the killing, and that he had turned himself in and confessed to the crime.

With regard to the negotiated sentence, the prosecutor characterized the agreed-upon sentence — 75 years' imprisonment with 25 years suspended — as the equivalent of a first-degree murder sentence imposed for a second-degree murder conviction. The prosecutor also noted that Thomas's sentence of 50 years to serve far exceeded the *Page* benchmark range of 20-30 years.[6]

The author of the presentence report agreed with the State that Thomas's substantial intoxication played a role in the crime and the author was critical of Thomas's failure to address his problems with substance abuse. The presentence investigator also noted, however, that Thomas's "grief, guilt, and remorse for his crime appear to be real," and that Thomas "does not present as a criminally minded individual, but as a man who has committed a horrendous criminal act."

At the sentencing hearing, Thomas and the State again explained why they believed that the court should accept the negotiated plea and sentence, and why they believed that the *Chaney* criteria were met by a sentence of 75 years with 25 years suspended in this case. The victim's parents reiterated their opposition to the negotiated sentence and their particular opposition to the fact that Thomas would be eligible for discretionary parole consideration after serving one-third of his sentence.

The victim's parents also presented a memorial photo montage of the victim's life. This photo montage was set to music played and sung by the victim herself (the Beatles song, "Blackbird").

---

[5]   *See* AS 11.81.900(a)(2).

[6]   *Page*, 657 P.2d at 855.

At the conclusion of this hearing, the superior court judge rejected the negotiated sentence as too lenient. The judge's primary reason for rejecting the plea agreement appears to have been the absence of any restriction on Thomas's eligibility for discretionary parole consideration. The judge stated that, in his view, Thomas had intentionally killed his girlfriend, notwithstanding the evidence of his severe intoxication, and that Thomas was therefore guilty of the more serious crime of first-degree murder. The judge further declared that it would "cheapen the crime" if Thomas were eligible to apply for discretionary parole after serving only one-third of the 50-year active term of imprisonment provided for in the plea agreement. The judge also indicated his belief that Thomas should remain in prison until he "aged out" of criminal behavior. According to the judge, this "aging out" generally happened around 50 years of age.

This petition followed.

*The various issues raised by the proceedings in this case*

The parties raise several significant legal issues in their pleadings to this Court. Chief among these issues is the scope of a trial court's authority to reject a plea agreement, as well as the standard that a trial court should employ when reviewing a negotiated plea agreement.

The State asserts that the trial court's role in approving or disapproving a plea agreement is a limited one, circumscribed by considerations of separation of powers and the court's more limited knowledge of the case in comparison to the parties. The State further asserts that a trial court's assessment of whether an agreed-upon sentence is too lenient is akin to an appellate court's assessment of whether a sentence is "clearly

mistaken."[7] That is, the trial court should limit its role to evaluating whether the agreed-upon sentence is within the permissible range of sentences that a reasonable judge could impose under the circumstances, rather than determining what the judge would impose in the first instance.[8] The State contends that, in this case, the sentence was well within that range of permissible sentences that a reasonable judge would impose, and the superior court therefore should have accepted the plea agreement.

Thomas separately argues that the court failed to provide adequate reasons for its rejection of the negotiated sentence, and Thomas asserts that the court's analysis of the negotiated sentence reflects a flawed understanding of the *Chaney* criteria and the governing law on discretionary parole. Thomas also points to the court's failure to compare Thomas's case to the full range of conduct encompassed by the second-degree murder statute, and the court's failure to recognize the negotiated sentence as an aggravated sentence, well above the *Page* benchmark.

Both parties also point to the role that emotion may have played in the court's rejection of the plea agreement, and they question the ability of the judge to neutrally assess the appropriateness of the negotiated sentence in the immediate aftermath of an emotionally fraught sentencing hearing involving a memorial photo montage of the victim, set to music.

We agree with the parties that these are important issues. However, we conclude that we do not need to resolve all of these issues at this time. Instead, we conclude that the appropriate course of action at this juncture is to alert the trial court to the more immediate legal errors in its stated reasons for rejecting the plea agreement, and

---

[7] *See McClain v. State*, 519 P.2d 811, 813 (Alaska 1974); *Erickson v. State*, 950 P.2d 580, 587 (Alaska App. 1987).

[8] *See Erickson*, 950 P.2d at 587.

to remand this case to the trial court for reconsideration of the plea agreement with the guidance provided here.

> *The legal errors that require us to vacate the superior court's rejection of the plea agreement*

As we have explained, one of the judge's paramount reasons for rejecting the plea agreement was the fact that Thomas would be statutorily eligible to be considered for discretionary parole under AS 33.16.090(b)(1) after serving one-third of his sentence. According to the judge, the sentencing goal of community condemnation could not be achieved in this case if the normal statutory eligibility requirements for discretionary parole applied in this case. Here is what the judge said about this matter:

> *The Court*: [T]he possibility of parole within 16 years of the [commission of the] crime[,] or 14 years from today, ... cheapens the crime. ... Alaska is a state in which domestic violence leading to murder is an extreme concern. And Alaskans demand that these kinds of crimes be properly condemned. And my assessment is that the possibility of parole before Mr. Thomas reaches the age at which he — most people typically age out [—] does not ... adequately express the community's condemnation for his crime.

This rationale is substantially flawed. When a judge sentences a criminal defendant and analyzes the need for a special restriction on the defendant's eligibility for discretionary parole, the judge must engage in a case-specific analysis of the facts and circumstances of the particular case and the particular defendant. Here, however, the judge's analysis is grounded on the judge's generalized view of the appropriate sentence for an entire *category* of cases — domestic violence murder.

The judge declared that no defendant in this category should be eligible to apply for discretionary parole until they "age out" — which, based on the context of the judge's remark, appears to be a reference to late middle age. This approach to parole

– 7 –                                                    2579

eligibility is inconsistent with the parole statutes, and it is based on policy determinations that are entrusted to the legislature, not the judiciary. As we explain in more detail in this decision, a judge has no authority to impose a more severe parole restriction on a defendant, untethered from the specifics of the defendant's case and based solely on the judge's belief that the discretionary parole statutes are not sufficiently harsh for that category of crime.

Moreover, there was no evidence in the record or presented at the hearings about when defendants typically "age out" of criminal behavior or why such a generalized assertion should necessarily apply to Thomas personally. Finally, the judge's comment about Thomas's eligibility for discretionary parole "cheapen[ing] the crime" strongly suggests that the judge was operating under incorrect legal assumptions about the procedures for granting discretionary parole and the circumstances under which discretionary parole is actually granted to defendants like Thomas.

There are two different kinds of parole under Alaska law — mandatory parole and discretionary parole. Discretionary parole is, as the term suggests, entirely at the discretion of the Alaska Parole Board.[9]

Under AS 33.16.090(b)(1), defendants such as Thomas who are sentenced for murder become eligible to be considered for discretionary parole after they have served one-third of their active term of imprisonment or the applicable mandatory minimum sentence, whichever is greater.[10] Because the plea agreement in Thomas's case

---

[9] The Parole Board is a five-member board appointed by the governor, and subject to confirmation by a majority of the legislature in joint session. *See* AS 33.16.020(a). Parole Board members are generally persons with significant law enforcement and corrections backgrounds. *See, e.g.*, Alaska Dep't. of Corrections, Parole Board, http://www.correct.state.ak.us/parole-board/members (last visited Nov. 15, 2017).

[10] AS 33.16.090(b)(1).

called for 50 years of active imprisonment (with 25 more years suspended), Thomas would become eligible to be considered for discretionary parole by the Alaska Parole Board after he served one-third of that 50-year sentence — that is, after he served 16 years and 8 months.

But eligibility to be considered for discretionary parole does not mean that the defendant will be granted discretionary parole at that point in time, or at any later point in time. Under AS 33.16.100(a), the Parole Board is authorized to grant a defendant discretionary parole only if it affirmatively finds that (1) the prisoner will live and remain at liberty without violating any laws or conditions imposed by the board; (2) the prisoner's rehabilitation and reintegration into society will be furthered by release on parole; (3) the prisoner will not pose a threat of harm to the public if released on parole; and (4) release of the prisoner on parole would not diminish the seriousness of the crime.[11]

Additionally, the victims of the crime (which includes family members of a victim who was murdered) have the right to be present at any Parole Board meeting in which discretionary parole of the defendant is considered.[12] The victims also have the right to submit oral or written comments.[13]

Because release on discretionary parole is so difficult to obtain, a sentencing judge is not permitted to consider a defendant's eligibility for discretionary

---

[11] AS 33.16.100(a).

[12] *See* AS 33.16.120(c); AS 33.16.900(15) (in this chapter, "victim" has the meaning given in AS 12.55.185); AS 12.55.185(19)(C).

[13] AS 33.16.120(c).

parole as a factor that is likely to reduce the jail time that the defendant will actually serve.[14]

In his initial comments, the judge acknowledged this governing law, noting that he was "not permitted to assume what the parole board would do." But the remainder of the judge's analysis indicates that this awareness was not meaningfully integrated into the judge's reasons for rejecting the proposed plea agreement.

For example, the judge rejected the negotiated sentence, in part, because he believed that allowing Thomas to be considered for discretionary parole under the statutory framework created by the legislature would "cheapen the crime." But, as just explained, the Parole Board is statutorily required to consider the "seriousness of the crime" when it evaluates a defendant for possible release on discretionary parole, and the Parole Board is prohibited from releasing a defendant on discretionary parole if such a release will "diminish the seriousness of the crime."[15] The judge's comment about Thomas's eligibility for discretionary parole "cheapen[ing] the crime" therefore strongly suggests that the judge was either unaware of this statutory requirement or that the judge erroneously believed that the Parole Board would fail to meet its statutory duty to consider the seriousness of the crime when deciding whether to release Thomas on discretionary parole.[16] The judge's comment also suggests that, despite the judge's

---

[14] *See Jackson v. State*, 616 P.2d 23, 24-25 (Alaska 1980) (recognizing that "the assumption that an offender will be paroled on a particular date is, at best, speculative" and instructing sentencing judges to assume that the defendant will serve the entire term of his imprisonment without release on discretionary parole when determining the proper length of a defendant's sentence).

[15] *See* AS 33.16.100(a)(4).

[16] *Cf. Newell v. State*, 771 P.2d 873, 877 (Alaska App. 1989) (reversing sentencing judge's restriction of defendant's parole as unsupported by the necessary findings and as "appear[ing] to imply a distrust of the parole board's ability to do its job").

claims to the contrary, the judge was viewing Thomas's initial parole eligibility date as essentially equivalent to the date on which Thomas would be granted discretionary parole.

Certainly, if the individual facts of a particular case warrant it, a sentencing judge does have the authority under AS 12.55.115 to further restrict a defendant's eligibility for discretionary parole beyond the normal statutory default. But as the Alaska Supreme Court reaffirmed in *Korkow v. State*, a judge's decision to restrict parole eligibility in a particular case must be supported by "expressly articulated reasons" — reasons that are case-specific, and that are backed by substantial evidence in the record.[17] The judge's decision must also be based on the *Chaney* criteria — with the recognition, as the Alaska Supreme Court noted, that "the most relevant factors often will be public safety and potential for rehabilitation."[18]

Here, the judge failed to provide any case-specific reasons for his conclusion that a restriction on discretionary parole was required in this case. Instead, the judge improperly relied on a generalized assumption about criminal defendants and his apparent disagreement with the sentencing scheme governing Thomas's case. In particular, the judge relied on what appears to be a generalized assumption about the age in which criminal defendants purportedly "age out" of their criminal behavior. Significantly, the judge did not provide any scientific, statistical, or other authority to support his assertion about when offenders typically "age out." Nor did the judge articulate any reason why he believed that this generalized assertion would necessarily apply to Thomas personally.

---

[17] *State v. Korkow*, 314 P.3d 560, 565 (Alaska 2013).

[18] *Id.*

We note that courts in other jurisdictions have been particularly critical of sentencing judges using these types of generalized assumptions, untethered to the specific facts of an individual case and an individual defendant. In *People v. Fisher*, for example, the Michigan Court of Appeals reversed a sentence that was based on this type of speculative assumptions about when a defendant is "beyond the age of violence," and the court strongly criticized the sentencing judge's reliance on this rationale as "totally inappropriate" and "antithetical" to the purpose of individualized sentencing and uniform sentencing guidelines.[19]

Here, the judge provided no support for his generalized assumptions for when criminal defendants typically "age out"; nor did he provide any reason for why he believed such generalized assumptions would apply to Thomas in particular. Instead, the judge's comments focused on the widespread occurrence of domestic violence in Alaska and the need for community condemnation of murders that occur within that context. The judge's comments also indicated that he believed *no sentence* for this type of crime could adequately express the community's condemnation of a domestic violence murder if that sentence allowed for the possibility of parole before the defendant "ages out."

By declaring that the sentencing goal of community condemnation required a special discretionary parole restriction for *any* young or middle-aged defendant convicted of murdering their spouse or domestic partner, the judge was essentially voicing his disagreement with the legislative policy decisions underlying the provisions of AS 33.16.090(b)(1). In other words, rather than making an individualized sentencing determination about parole eligibility based on the facts of Thomas's specific case, the judge was voicing his disapproval of the sentencing framework enacted by the legislature for murder defendants in general. This was improper.

---

[19] *People v. Fisher,* 439 N.W.2d 343, 344 (Mich. App. 1989).

While a sentencing judge has the authority to impose a greater restriction on parole eligibility based on the facts of a particular case, a judge has no authority to impose enhanced parole restrictions on an entire category of defendants based on his belief that the parole statutes are not strict enough for that type of crime. Such sentencing policy decisions are entrusted to the legislature.[20]

The judge's error in this case is akin to the type of judicial error that can occur in the context of presumptive sentencing. As we have explained in previous cases, the statutory presumptive ranges of imprisonment represent the legislature's determination of the appropriate sentencing ranges for a typical offender committing a typical offense within that category of offenses.[21] A sentencing judge has no authority to depart from those presumptive ranges unless the specific facts of the individual case and the individual offender warrant such a departure.[22]

Thus, a sentencing judge may exceed the applicable presumptive range only if a statutory aggravating factor is found and the judge determines that the *Chaney* criteria cannot otherwise be met by a sentence within the presumptive range.[23] Likewise, the judge may impose a sentence lower than the presumptive range only if a mitigating factor is found.[24] (The judge may also refer the case to the three-judge sentencing panel

---

[20]   *See Leuch v. State*, 633 P.2d 1006, 1012-13 (Alaska 1981) ("[J]udgments as to the extent to which the community condemns a particular offense are more properly made in the legislative [arena] than by the judiciary.").

[21]   *See Beltz v. State,* 980 P.2d 474, 480 (Alaska App. 1999); *see also Leuch*, 633 P.2d at 1012-13.

[22]   *Beltz*, 980 P.2d at 480.

[23]   AS 12.55.155(c).

[24]   AS 12.55.155(d).

based on non-statutory mitigating factors or a finding that manifest injustice would result from imposition of a sentence within the presumptive range on that particular offender.[25]) But judges have no authority to depart from the presumptive range based on their disagreement with the legislature's decision concerning the appropriate presumptive range for that offense.

As we explained in *Beltz v. State*:

> A presumptive term cannot be "manifestly unjust" in general. It can only be "manifestly unjust" as applied to a particular defendant. Before a sentencing judge can properly characterize a presumptive term as "manifestly unjust", the judge must articulate specific circumstances that make the defendant significantly different from a typical offender within that category or that make the defendant's conduct significantly different from a typical offense.[26]

This same principle applies to the present case. The legislature has established rules that govern parole eligibility for offenders convicted of murder. A sentencing judge is not allowed to impose more severe parole restrictions on all murder defendants who kill their spouses or domestic partners based on the judge's belief that, as a general matter, Alaska's parole eligibility rules do not satisfy the sentencing goal of community condemnation for that type of crime or this group of offenders.

Nor can a sentencing judge's decision to restrict parole eligibility be based on the judge's generalized view that criminal defendants will continue to commit crimes until they reach a certain age, or on the judge's unsupported belief that the Parole Board

---

[25] AS 12.55.165; AS 12.55.175; *see also State v. Seigle*, 304 P.3d 627, 635-638 (Alaska App. 2017).

[26] *Beltz*, 980 P.2d at 480.

will fail to fulfill its statutory obligations to properly screen applications for discretionary parole.

*Conclusion*

For the reasons explained here, we GRANT Thomas's petition for review, and we VACATE the superior court's rejection of the proposed plea agreement. We direct the superior court to reconsider this matter in light of what we have said in this opinion. We do not retain jurisdiction of this case.